UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RICHARD E. OBRINGER PAC, A PROFESSIONAL CORPORATION,** *d/b/a* **ADVANCED SURGICAL ASSOCIATES,** *on behalf of itself and all others similarly situated*, | |
| | NO. _____ |
| Plaintiff, | |
| | **JURY TRIAL DEMANDED** |
| **v.** | |
| **CARDCONNECT CORP.,** | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Richard E. Obringer PAC, a Professional Corporation, *d/b/a* Advanced Surgical

Associates ("ASA"), on behalf of itself and a class of similarly situated entities, brings this Class

Action Complaint against Defendant CardConnect Corporation. The allegations below are based

on Plaintiff's personal knowledge, the investigation of counsel, and information and belief:

### NATURE OF THE CASE

1.      This Class Action Complaint seeks monetary damages, restitution, and

declaratory relief from CardConnect in connection with its improper business practices in the

sale of merchant processing services.

2.      In today's business world, and particularly since the COVID-19 pandemic made

many transactions cashless, the vast majority of merchants must accept payment for goods and

services via credit and debit cards to stay competitive in the marketplace. To accept this method

of payment, a merchant must use merchant services.

3.      The cost of merchant services is one of the highest expenses that most merchants

1

incur, following labor and production costs. Merchants rely on the companies to provide merchant services at a fair price and in accordance with fair and appropriate terms as agreed upon by the parties.

4.      CardConnect provides merchant services to small businesses and their owners, including Richard Obringer and his physician assistant staffing company, ASA. CardConnect's role is to ensure that payment card transactions are processed correctly. In exchange for these services, CardConnect receives a small percentage of each transaction and specific, agreed-upon fees. CardConnect has direct access to the merchant's bank account and takes its cut before passing the customer payments through to the merchant each month.

5.      But CardConnect deceives merchants like Plaintiff into paying much more than agreed upon by sneaking unauthorized junk fees into customers' billing statements each month.

6.      CardConnect induces merchants to retain its merchant services by promising specific, agreed-upon fees and rates for payment processing services included in boilerplate contracts ("Merchant Agreements").

7.      But then CardConnect unilaterally charges new, expensive fees that the customers never agreed to pay.

8.      Plaintiff has been a CardConnect customer since 2018. Although Plaintiff agreed only to pay certain fees identified in the Merchant Agreement, in 2024, CardConnect charged it several additional fees that were never authorized.

9.      In 2016, CardConnect customers, fed up with CardConnect's practices, brought suit in this Court to seek return of the unauthorized fees CardConnect had charged and prevent CardConnect from assessing fees the customers had never agreed to pay, and failing to provide timely notice of changes to fees. *Kao v. CardConnect Corp.*, No. 16-cv-5707 (E.D. Pa.). Despite

multiple Court orders finding that CardConnect could only charge the fees identified in the Merchant Agreement, CardConnect continues to slam its customers, including Plaintiff, with unauthorized fees.

10.     Plaintiff thus brings this action to seek reimbursement of the fees that CardConnect improperly charged and collected, and to prevent CardConnect from continuing to impose unauthorized charges upon its customers.

## PARTIES

11.     Plaintiff ASA is a Nevada corporation with a principal address at 11413 Perugino Drive, Las Vegas, NV 89138. Richard Obringer is the principal owner of ASA. He is a citizen of Nevada. CardConnect obligated Mr. Obringer to sign as a guarantor for ASA.

12.     Defendant CardConnect is a Pennsylvania corporation with a principal address at 1000 Continental Drive, Suite 600, King of Prussia, PA 19406.

## JURISDICTION AND VENUE

13.     Jurisdiction is proper under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because there are more than 100 potential class members and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest, fees, and costs, and some class members, including Plaintiff, are citizens of states other than Pennsylvania.

14.     This Court has jurisdiction over Defendant because it conducts substantial business in this District. Its headquarters is located in King of Prussia, Pennsylvania, and it maintains significant, continuous, and pervasive contacts in this District.

15.     Venue lies in this District under 28 U.S.C. § 1391 because Defendant has its headquarters here and conducts substantial business in this District, and a substantial portion of the events, omissions, and acts giving rise to the claims herein occurred in this District.

## COMMON FACTUAL ALLEGATIONS

### A.  Background on Merchant Services

16.     When a consumer makes a purchase using a debit or credit card, the way that transaction is processed includes many potential parties: (a) the bank that issued the card to the customer, like Chase or Bank of America; (b) the card association through which the transaction is processed, like Visa or Mastercard; (c) the card association's member bank; (d) the company that actually processes the payment; (e) the company that sells or leases payment processing equipment (where the customer swipes the card) to the merchant; and (f) the payment processor, such as CardConnect, that ensures payments are processed, handles monthly billing, and maintains the relationship with the merchant.

17.     Because these transactions are so complicated, it can be challenging for small businesses to assess how much the transaction will cost. Accordingly, front-end explanation and clarity by payment processors is essential. But unfortunately, some payment processors, like CardConnect, take advantage of their position. They induce small businesses to purchase merchant services without disclosing fees they charge or intend to charge.

18.     CardConnect is a payment processor that provides merchant services, allowing small businesses to accept payments via debit or credit card in exchanged for a fixed percentage of sales and certain specific, agreed-upon fees.

19.     When a customer pays a merchant that uses CardConnect's services with a payment card, CardConnect processes the transaction using the customer's payment information and facilitates the transfer of funds directly into the merchant's business account. Every month, CardConnect withdraws its cut directly from the merchant's account and issues a billing statement reflecting the amount withdrawn.

4

20.    Merchants who engage CardConnect for merchant services sign up using CardConnect's standard Merchant Agreement. *See* Merchant Applications and Agreement, attached here as **Exhibit A**. That agreement includes contractual information, including CardConnect's payment rates per transaction and any other agreed upon fees. The Merchant Agreement also requires a personal guarantee for the merchant's principals, and signature blocks for both CardConnect and its bank, Wells Fargo Bank N.A ("Wells Fargo").

21.    The Merchant Agreement also requires that an individual person sign and "unconditionally guarantee . . . the full and prompt payment of" the merchant. Ex. A.

22.    Acceptance by CardConnect and the member bank are express conditions of the Merchant Agreement. For example, the Merchant Agreement states that "this agreement shall not take effect until Merchant has been approved by CardConnect and/or the Member Bank [later defined as Wells Fargo Bank, N.A.] and a merchant number is issued." *Id.*

23.    The signature requirement is mutually beneficial. It provides assurances to merchants that they can enforce the proposed contract. And it allows CardConnect and Wells Fargo to have final say over whether they are bound to contract with merchants.

24.    In many instances, however, CardConnect does not actually execute the agreement and, upon information and belief, Wells Fargo never signs the Merchant Agreement. Under those circumstances, no enforceable written contract is ever created.

25.    In addition, in many instances, CardConnect never provides an executed copy of the Merchant Agreement to the merchant customer who signed it, even upon the customer's request. And unbeknownst to its customers, the fine print terms that CardConnect intends to largely govern the contractual relationship are set forth in a separate document that CardConnect also never provides to merchants.

**B.  CardConnect hides unfair provisions in its secret Program Guide.**

26.    The Merchant Agreement purports to integrate a much longer, legally dense document, referred to as the Program Guide. CardConnect salespeople do not carry the Program Guide with them and do not share the Program Guide with its customers. The Program Guide includes nearly 50 pages of small-print legalese, so it is widely understood that no merchant (and many of the individuals that sell this product) would ever read or understand it completely.

27.    In this way, merchants like the Plaintiff see and execute one document, which prominently displays the agreed-upon rates and fees (the Merchant Agreement) but are also purportedly bound by a separate document (the Program Guide). After merchants and their principals sign the contracts and the parties begin to do business, CardConnect imposes new, unanticipated processing fees on its customers, apparently taking the view that its secret Program Guide gives it this right.

28.    The Merchant Agreement never states that the advertised and agreed-upon rates and fees will increase (nor would increases be expected, since technology and competition have driven costs for payment processing down). Nor does the Merchant Agreement state that new, previously undisclosed fees and rates will ever be charged.

29.    Such terms are unquestionably important to merchants and would impact their decision to do business with CardConnect.

30.    Yet instead of clearly and conspicuously disclosing these terms to its merchant clients, many of whom are small businesses, CardConnect hides them in a document that merchants never even have the opportunity to read.

31.    CardConnect's secret Program Guide purports to allow CardConnect to increase its fees or add new fees with thirty days' notice. The Program Guide purports to give

CardConnect unilateral and unlimited discretion to charge whatever it wants for merchant services, even if such rates and fees are vastly different and higher than those set forth in the Merchant Agreement.

32.     Further, the timing of CardConnect's notice to customers of new fees is problematic. As part of the settlement in *Kao*, discussed below, CardConnect agreed as follows:

> In addition, subject to approval by the Court and as additional consideration for the releases of the claims of the Current Class Members, CardConnect agrees to amend the terms and conditions governing its merchant agreement so that an individual Current Class Member will have a fifty (50)-day window after notice of a CardConnect-initiated fee increase or new fee to terminate its account without payment of an early termination fee. CardConnect agrees to implement such amendment within sixty (60) days of the Effective Date, and the amendment shall remain in effect for no less than three (3) years. Defendant shall notify all Current Class Members of this amendment to the Merchant Agreement at least thirty (30) days prior to the amendment taking effect, which notice may take the form of a summary notice located in the merchant's monthly statement."

Settlement Agreement, Section 9.2.2.

33.     Upon information and belief, CardConnect never amended its agreement to reflect this requirement.

34.     Relying on its unfair provisions, CardConnect frequently imposes previously undisclosed fees on its customers, who have never agreed to pay anything beyond what was disclosed in the Merchant Agreement.

35.     CardConnect often includes unilateral notices in customer billing statements announcing that it will be adding new charges in the following months. CardConnect apparently takes the view that the Program Guide gives it the right to change its agreements with merchants in this manner, even if the merchants never previously agreed to the new charges.

36.     If CardConnect disclosed all of its fees in the Merchant Agreement, much less that

it intends to give itself the right to charge whatever fees it wants whenever it wants, merchants would be less likely to do business with CardConnect. So, CardConnect instead imposes these fees on merchants via a separate document, after the relationship has commenced and the merchant is locked in to long term deals that are only terminable upon payment of hefty early termination penalties.

37.     CardConnect then seizes these amounts from merchant bank accounts before the merchants even know they are gone. By the time merchants receive statements advising them of the prior month's processing charges, CardConnect has already taken the fees from the merchants' bank accounts.

**C. CardConnect has been sued for these exact practices before.**

38.     In 2016, CardConnect customers fed up with CardConnect's deceptive practices filed a lawsuit in this Court to stop CardConnect from burdening them with fees that they had never agreed to pay. *See Kao v. CardConnect, Inc.*, No. 16-cv-5707-GJP (E.D. Pa.).

39.     After extensive briefing, Eastern District of Pennsylvania (Ditter, J.) entered an order finding that because CardConnect and Wells Fargo never signed the Merchant Agreement, no express contract was formed. Rather, under the parties' implied contract, "**CardConnect agreed to provide its services for the fees and rates set forth in [the Merchant Agreement] and is limited to those terms absent a mutual modification of the implied contract.**" *See Kao v. CardConnect Corp.*, No. 16-cv-5707 (E.D. Pa. Sept. 26, 2018), Dkt. 69.

40.     The Court further held that unsolicited and unilateral changes to the terms of the Merchant Agreement imposed by CardConnect, including by placing notices of future fees and rate increases in billing statements, were unenforceable. *Id.*

41.     Thus, the Court limited the fees that CardConnect could charge to those identified

in the Merchant Agreement. *Id.*

42.     The Court (Pappert, J.) upheld its findings on reconsideration. *See Kao v. CardConnect Corp.*, No. 16-cv-5707 (E.D. Pa. June 26, 2019), Dkt. 98.

43.     Despite the Court's orders limiting CardConnect to the fees it identifies in the Merchant Agreement, CardConnect has not changed its practices. Instead, CardConnect continues to unilaterally impose *new* fees upon its customers, even though its customers never agreed to pay them.

**D. CardConnect charged Plaintiff unauthorized fees.**

44.     Richard Obringer is a licensed physician assistant. ASA supplies surgical practices with physician assistant services.

45.     Mr. Obringer is partially retired, and ASA's income fluctuates from month to month, so when Mr. Obringer was looking for a company to provide payment processing services, cost and fees were his top consideration.

46.     In or around 2018, a sales representative from CardConnect approached Mr. Obringer and pitched CardConnect's services. The sales representative explained that CardConnect would take a fixed percentage of ASA's payment card transactions, with a monthly minimum transaction amount of $25, plus certain agreed upon fees. Because Mr. Obringer felt that ASA could afford CardConnect's fee structure, he agreed to sign up.

47.     CardConnect presented Plaintiff with its standard Merchant Agreement. *See* Ex. A. The Merchant Agreement included pricing terms and specified the fees that Mr. Obringer and ASA agreed to pay:

      a.   A Chargeback Fee of $25;

      b.   Retrieval Fee of $15;

    c.   Minimum Processing Fee of $15;

    d.   PCI Non-Compliance Monthly Fee of $19.95;

    e.   Telecheck statement processing fee of $5.00;

    f.   Customer requested operator call fee of $2.50; and an

    g.   ESA Chargeback fee of $5.00.

48.     Plaintiff was satisfied with the rates, terms, and fees explicitly and prominently denoted on the Application and decided to do business with CardConnect.

49.     Mr. Obringer and ASA signed CardConnect's standard Merchant Agreement on April 17, 2018, with Mr. Obringer signing as guarantor for ASA.

50.     The Merchant Agreement that Plaintiff signed does not state that the fees or CardConnect's rates will increase at any point, that the fees could change in the future, or that the fees were merely introductory.

51.     Although the Merchant Agreement that Plaintiff signed states that "this agreement shall not take effect until Merchant has been approved by CardConnect and/or the Member Bank and a merchant number is issued," and even though the Merchant Agreement further states that "the [Member] Bank must be a principal (signer) to this Agreement," neither CardConnect nor Wells Fargo ever counter-signed the Merchant Agreement.

52.     CardConnect did not provide Plaintiff with a copy of the Merchant Agreement after Plaintiff submitted it.

53.     CardConnect has never provided Plaintiff with a copy of the Program Guide.

54.     On October 10, 2018, Mr. Obringer requested that CardConnect supply "a copy of our contract which was never provided to me," but CardConnect did not respond to his request.

55.     The Merchant Agreement identified the specific fees that ASA was obligated to

pay in the Merchant Agreement, but CardConnect has charged additional fees that Plaintiff never agreed to.

56.     For example, CardConnect repeatedly charged Plaintiff fees of $119 and $199.99 for "Annual Compliance SVC Fee." Plaintiff had never authorized CardConnect to charge a fee for "Annual Compliance SVC."

57.     In January 2024, CardConnect charged Plaintiff a $215 "Annual Fee Security Bundle." Plaintiff had never authorized CardConnect to charge an annual $215 fee for a "Security Bundle," which was not included in the Merchant Agreement.

58.     In February 2024, CardConnect charged Plaintiff a $200 "Annual Membership Fee." Plaintiff had never authorized CardConnect to charge an annual membership fee of $200, which was not included in the Merchant Agreement.

59.     In March 2024, CardConnect charged Plaintiff a fee of $29.95 for "Non-Receipt of PCI Validation." Although Plaintiff had agreed to pay a fee for PCI Non-Compliance, it had only agreed to pay $19.95, not $29.95.

60.     Although Plaintiff never agreed to pay those fees and other undisclosed fees, CardConnect direct-debited the fees from ASA's bank account. As is CardConnect's practice, it took the fees from ASA's account before Plaintiff received statements itemizing such charges.

61.     Plaintiff sought refunds of some of the fees that CardConnect charged without authorization, but to date, CardConnect has only provided a partial refund and has not provided full refunds for the amounts that it charged Plaintiff without Plaintiff's agreement or authorization.

62.     In May 2024, Plaintiff contacted CardConnect to attempt to cancel CardConnect's services. Specifically, Mr. Obringer emailed his contact at CardConnect stating that he was

revoking his authorization for CardConnect to further debit any ACH amounts from his bank account.

63.    CardConnect disregarded Mr. Obringer's instructions and billed him $25 in May 2024. Mr. Obringer was forced to place a stop payment against CardConnect with his bank to ensure he would not be charged again.

64.    In June of 2024, CardConnect finally provided Plaintiff with a copy of the Merchant Agreement that Plaintiff signed, which does not bear the signatures of CardConnect or Wells Fargo, and which does not append the Program Guide. *See* Ex. A.

## CLASS ACTION ALLEGATIONS

65.    Pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), Plaintiff bring this class action on behalf of itself and all those meeting the following class definition:

**Class:** All persons and entities in the United States against which CardConnect assessed amounts not explicitly identified in their Merchant Agreement, after July 8, 2020.

**Subclass:** All persons and entities Nevada against which CardConnect assessed amounts not explicitly identified in their Merchant Agreement, after July 8, 2020.

66.    Plaintiff reserves the right to modify or amend the definition of the proposed Class and Subclass (collectively, "Class"), or add other proposed classes or subclasses, before the Court determines whether certification is appropriate and as the Court may otherwise allow.

67.    Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

68.    The time period for the Class is July 8, 2020 until such time as Defendant remedies the conduct complained of herein.

69.     The proposed Class meets all requirements for class certification.

70.     **Numerosity.** The members of the Class are so numerous that joinder would be impractical. The Class consists of, at the very least, thousands of members and the identity of those persons and entities is within the knowledge of Defendant and can be ascertained by resort to CardConnect's records.

71.     **Typicality.** Plaintiff's claims are typical of the claims of the Class. Plaintiff, like other Class members, were charged amounts not explicitly identified in the Merchant Agreement. Plaintiff, like all members, have incurred monetary damages as a result of CardConnect's misconduct. And the factual basis of Defendant's misconduct is common to the members of the Class and represents a common thread of conduct resulting in injury to the Class members.

72.     **Commonality.** There are numerous questions of law and fact common to the Class. Those common questions predominate over any questions affecting only individual Class members. Among those common questions of law and fact are the following:

     a.   Whether CardConnect required merchants to enter the same or materially similar contracts during the Class Period;

     b.   Whether CardConnect and Wells Fargo signed any customer contracts;

     c.   Whether CardConnect's and Wells Fargo's signatures were conditions precedent to the formation of contracts between CardConnect and its customers;

     d.   When CardConnect began assessing or increasing each improper charge;

     e.   Which of CardConnect's fees are improper or unauthorized;

     f.   Whether CardConnect was unjustly enriched by its conduct;

     g.   Whether, if contracts between CardConnect and its customers existed, those contracts contain terms that are unconscionable or otherwise unenforceable;

    h.   The terms of any implied contract created between CardConnect and its customers;

    i.   Whether CardConnect breached the covenant of good faith and fair dealing;

    j.   The proper measure of damages;

    k.   Whether Plaintiff and the Class are entitled to punitive damages; and

    l.   Whether Plaintiff and the Class are entitled to equitable relief.

73.    **Adequacy.** Plaintiff is an adequate class representative. Plaintiff has suffered the harm alleged to have harmed the Class and have no interests antagonistic to the interests of any Class members. It has hired competent counsel experienced in class actions, and it and its counsel are committed to the vigorous prosecution of this case.

74.    **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual's individual claim is small relative to the complexity of the litigation, most Class members likely could not afford to seek legal redress for the harms alleged herein—nor would it be efficient to do so. Thus, absent a class action, Class members will be unable to obtain redress for their losses.

75.    Even if Class members could afford individual litigation, the court system could not. Individualized litigation would significantly increase the delay and expense to all parties and the Court, and create the potential for inconsistent or contradictory rulings. By contrast, a class action presents fewer management difficulties, allows claims to be heard that might otherwise go unheard, and provides the economies of scale, comprehensive supervision, and other benefits of adjudication by a single court. Accordingly, a class action is a superior method for adjudicating Plaintiff's and the Class's claims.

**REQUESTS FOR RELIEF**

**COUNT I**
**DECLARATORY RELIEF: THE PROGRAM GUIDE IS NOT A BINDING CONTRACT**
(*On behalf of Plaintiff and the Class*)

76.    Plaintiff fully restates and incorporates paragraphs 1 through 75 above.

77.    Classwide declarative relief is appropriate where a Defendant has acted or refused to act on grounds that apply generally to the Class.

78.    Defendant has established a system through which it obtains merchant signatures on its form Merchant Agreements, but does not itself sign or have Wells Fargo sign the contract.

79.    The Merchant Agreement, however, expressly requires that both CardConnect and Wells Fargo sign before the contract can "take effect." The Program Guide also contains provisions requiring CardConnect and the Member Bank (Wells Fargo) to sign the Merchant Agreement before it can take effect. Since neither Card Connect nor Wells Fargo ever sign the Merchant Agreement, no express contractual agreement is ever formed between the parties. *E.g.*, *Franklin Interiors v. Wall of Fame Mgmt. Co.*, 511 A.3d 761, 762 (Pa. 1986) (holding that if effectiveness of a contract is "expressly conditioned upon the written approval" of a party and that party never signs, no enforceable contract exists).

80.    If there is no written, enforceable agreement between CardConnect and its merchant customers, it follows that the Program Guide is also not an enforceable contract.

81.    Further, Plaintiff and the other Class Members have never received the Program Guide or had the opportunity to review its terms prior to executing the Merchant Agreement. Accordingly, there was no meeting of the minds as to the terms of the Program Guide before the Merchant Agreements were executed.

82.    Plaintiff therefore requests a declaration that there is no express contract between

15

CardConnect and Plaintiff (or the Class members), and that the Program Guide is not a binding contract enforceable against Plaintiff or the Class Members.

83.     Plaintiff also requests that the Court find that CardConnect and Wells Fargo cannot now, belatedly, sign the Merchant Agreements to give them effect.

84.     The ruling sought herein is consistent with this Court's orders in *Kao v. CardConnect, Inc.*, No. 16-cv-5707-GJP (E.D. Pa.) at Dkts. 69 and 98.

85.     Judicial declarations in this regard are necessary and appropriate so the parties may ascertain their rights, duties, and obligations with respect to one another.

**COUNT II**
**UNJUST ENRICHMENT**
***(On behalf of Plaintiff and the Class)***

86.     Plaintiff fully restates and incorporates paragraphs 1 through 75 above.

87.     Plaintiff and the Class members conferred benefits on Defendant in the form of fees in amounts that they never agreed to pay.

88.     Defendant has received, recognized, and enjoyed those unearned benefits, which were unearned because they were not agreed to or authorized by Plaintiff or the Class members.

89.     Permitting Defendant to retain these benefits would be unjust. CardConnect and the Class members, including Plaintiff, expressly negotiated the fees that CardConnect could charge for merchant services, yet CardConnect in many instances seized additional fees that Plaintiff and the Class members had not agreed to pay.

90.     CardConnect seized these amounts before providing Plaintiff and the Class members with billing statements itemizing the overcharges.

91.     It would be unjust, inequitable, and unconscionable for CardConnect to retain the improperly received amounts that exceed the agreed-upon charges.

92.     Plaintiff and the Class members thus seek restitution or reimbursement of these fees and an order requiring disgorgement of profits, benefits, and other compensation obtained by CardConnect by virtue of the conduct described herein.

**COUNT III**
**BREACH OF EXPRESS OR IMPLIED CONTRACT, INCLUDING BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**
***IN THE ALTERNATIVE***
**(*On behalf of Plaintiff and the Class*)**

93.     Plaintiff fully restates and incorporates paragraphs 1 through 75 above.

94.     Plaintiff brings this claim in the alternative to Count II above.

95.     In the event the Court finds that the Merchant Agreement reflects a contract, CardConnect's conduct materially violated the specific terms of such contracts. Further, CardConnect has breached the contract by violating the covenant of good faith and fair dealing.

96.     CardConnect violated its contracts with customers by assessing improper charges not provided in its Merchant Agreements, to include improperly inflated charges and fees not mentioned in the contract.

97.     Plaintiff and the Class members have performed all, or substantially all, of the obligations imposed on them under the contracts.

98.     Upon information and belief, the Program Guide states that Pennsylvania law applies to disputes, so the elements of this claim are identical for all members of the Class.

99.     Pennsylvania law imposes upon each party to a contract the duty of good faith and fair dealing. Good faith and fair dealing means preserving the spirit, not merely the letter, of the bargain. Evading the spirit of the bargain and abusing the power to specify terms are violations of this covenant.

100.    A lack of good faith may be overt and may also consist of inaction. Subterfuge

and evasion violate the obligation of good faith in performance.

101.    By charging fees inconsistent with those agreed in the standard Merchant Agreements, CardConnect has violated the spirit of its contracts with its customers and breached the covenant of good faith and fair dealing. Even if CardConnect believed it had contractual discretion to increase markups and fees, or add new fees, such discretion is constrained by good faith and fair dealing. CardConnect's actions do not comport with its duty.

102.    Plaintiff and the Class members sustained damages as a result of CardConnect's breaches of contract and breaches of the covenant of good faith and fair dealing.

103.    Plaintiff and the Class members seek damages in an amount to be determined at trial.

**COUNT IV**
**VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT**
(*On behalf of Plaintiff and the Subclass*)

104.    Plaintiff fully restates and incorporates paragraphs 1 through 75 above.

105.    The Nevada Deceptive Trade Practices Act ("NDTPA") prohibits deceptive trade practices. *See* Nev. Rev. Stat. § 41.600 *et seq.*; Nev. Rev. Stat. § 598.0915 *et seq.*

106.    Any person who is a victim of consumer fraud, including a deceptive trade practice, may bring an action under the NDTPA. *See* Nev. Rev. Stat. § 41.600.

107.    Businesses may bring claims under the NDTPA. *See, e.g.*, *Switch, Ltd. v. Uptime Institute, LLC*, 426 F. Supp. 3d 636, 643 (D. Nev. 2019) (viable NDTPA claim brought by a business plaintiff); *Reva Int'l, Ltd. v. MBraun, Inc.*, No. 06-cv-0306, 2007 WL 4592216, at *5-6 (D. Nev. Dec. 28, 2007) ("[T]here is no indication that . . . a corporation can't be the victim [of] a deceptive trade practice.").

108.    A person engages in a deceptive trade practice if the person:

a.   Advertises goods or services with intent not to sell them as advertised, Nev. Rev. Stat. § 598.0915(9);

b.   Makes false or misleading statements of fact concerning the price of goods or services for sale, *id.* § 598.0915(13); or

c.   Knowingly makes a false representation in a transaction, *id.* § 598.0915(15).

109.   CardConnect engaged in deceptive trade practices when it (1) advertised its merchant services with intent to sell those services at much higher, undisclosed costs; (2) made false and misleading statements regarding the fees it imposes on customers in the Merchant Agreements; and (c) made false representations about its fees, then imposed different, previously undisclosed fees.

110.   Plaintiff and the Subclass members were harmed by CardConnect's deceptive trade practices.

111.   Accordingly, Plaintiff, for the benefit of itself and the Subclass members, seeks an order awarding damages, an injunction prohibiting CardConnect from continuing to assess fees not specifically described in the Merchant Agreements, Plaintiff's costs and attorneys' fees, and any other monetary and equitable relief the Court may deem appropriate.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all claims so triable.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, seeks a ruling:

A.   Certifying this case as a class action pursuant to Rule 23, naming ASA as the class representative, and appointing its counsel as Class Counsel;

B.   Awarding declaratory relief as requested herein;

C.      Awarding restitution and reimbursement of all improper fees paid to Defendant by Plaintiff and the Class members as a result of the wrongs alleged herein in an amount to be determined at trial;

D.      Compelling disgorgement of all ill-gotten gains derived by Defendant from its misconduct;

E.      Awarding damages in an amount according to proof, including compensatory, general, nominal, and punitive and exemplary damages, as allowed by law;

F.      Awarding pre-judgment interest at the maximum rate permitted by law;

G.      Reimbursing all costs and disbursements accrued by Plaintiff in connection with this action, including reasonable attorneys' fees; and

H.      Awarding such other relief as this Court deems just and proper.

Dated: July 11, 2024                    Respectfully submitted,

*/s/ Ken Grunfeld*
Kenneth Jay Grunfeld (PA Bar # 84121)
Jeff Ostrow (*pro hac vice* to be filed)
Jonathan Streisfeld (*pro hac vice* to be filed)
**KOPELOWITZ OSTROW P.A.**
65 Overhill Road
Bala Cynwyd, PA 19004
Tel: 954.332.4200
ostrow@kolawyers.com
streisfeld@kolawyers.com
grunfeld@kolayers.com

Hassan A. Zavareei (*pro hac vice* to be filed)
Katherine M. Aizpuru (*pro hac vice* to be filed)
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue NW, Suite 1010
Washington, D.C. 20006
Phone: (202) 973-0900
Fax: (202) 973-0950
hzavareei@tzlegal.com
kaizpuru@tzlegal.com